## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Kimberly A. Ponder, | |
| Plaintiff, | Case No. 3:20-cv-50041 |
| v. | Honorable Iain D. Johnston |
| County of Winnebago, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

If Barney Fife were a human resources director, he would preach that alleged employment issues should be nipped in the bud. When employers—particularly governmental bodies—fail to timely act on an employee's alleged performance deficiencies, they leave themselves vulnerable to claims of retaliation when they finally get around to addressing the alleged deficiencies. So, when parties present evidence of competing reasonable theories as to why an employee was terminated— whether for performance issues or retaliation—the consequence is a trial, usually before a jury. What's more, the whole process gets really ugly when the issues relate to local political infighting.

Plaintiff Kimberly A. Ponder brings this case against Defendant County of Winnebago ("the County"). The County now moves for summary judgment. For the following reasons, the Court denies summary judgment.

1

## I.  Legal Standard

### A.  Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). However, "[s]peculation is insufficient to withstand summary judgment." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). Indeed, "the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B.  Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts

presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

Local Rule 56.1 requires a party seeking summary judgment to file an accompanying statement of facts, with numbered paragraphs and citations to the record supporting those facts. *See* LR 56.1(d). To assert new facts, the party opposing summary judgment must file its own statement of facts. LR 56.1(b)(3). "Factual allegations not properly supported by citation to the record are nullities." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). In responding to these asserted facts, if a party wishes to dispute a fact, it must "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." LR 56.1(e)(3). A response "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." LR 56.1(e)(2). Neither the factual assertions nor the responses should contain legal argument beyond objections in responses. LR 56.1(d)(4), (e)(2).

## II. Background

As a preliminary note, the factual record in this case contains many disputes: the parties often agree that a declarant's testimony has been accurately summarized, but they disagree that the testimony itself is accurate. Both parties generally followed the requirements laid out by Local Rule 56.1—the County submitted its statement of facts, Dkt. 99 ("DSOF"); Ms. Ponder both responded to the County's statement of facts, Dkt. 107 ("PRDSOF"), and submitted her own statement of additional facts, Dkt. 108 ("PSOF"); and the County submitted its

response to Ms. Ponder's statement of additional facts, Dkt. 115 ("DRPSOF")—but
there are some issues. For example, some of the factual assertions and responses
contain legal arguments,[1] and some responses set forth new facts that aren't
responsive to the asserted facts.[2] Under Local Rule 56.1, the Court ignores any
noncompliant portions of the statements of facts. *See* LR 56.1(d)(4), (e)(2).

Ms. Ponder's statement of additional facts relies heavily on her own affidavit,
which the County argues is a "sham." Dkt. 114 at 2. The sham-affidavit rule is a
narrow rule that "prohibits a party from submitting an affidavit that contradicts the
party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316
(7th Cir. 2020). However, a "self-serving" affidavit should not be excluded just
because of its self-serving nature. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir.
2013) ("As we have repeatedly emphasized over the past decade, the term 'self-
serving' must not be used to denigrate perfectly admissible evidence through which
a party tries to present its side of the story at summary judgment."); *see also Buie v.
Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). In using Ms. Ponder's
affidavit, the Court ignores only statements that directly contradict her previous
sworn testimony. When purportedly contradictory statements can be reconciled,

---

[1] *E.g.*, DRPSOF 24 ("Nevertheless, Plaintiff was an at-will employee, and there was no requirement
that Paschal or any other supervisor (or the County Board) discuss this or any other performance-
related issue with Plaintiff was a prerequisite to recommending or imposing discipline or
termination."); PSOF 13 ("Plaintiff responds that this is misleading and disingenuous . . . .").
[2] *E.g.*, PRDSOF 37 (responding to the asserted fact that the recommendation memo said Ms. Ponder
failed to update some policies as part of her duties with the fact that Mr. Haney recalled no
discussion of this as a basis for termination); DRPSOF 15 (responding to the asserted fact that Ms.
Paschal and Mr. Haney never discussed delays in implementing an employee training program as a
basis for termination with the fact that Mr. Haney believed FMLA had no bearing on Ms. Ponder's
termination).

such as a plausible lapse in memory during deposition, the Court does not apply the sham-affidavit rule. *See James*, 959 F.3d at 317.

Here is a summary of the facts. Ms. Ponder began working in the Winnebago County Human Resources ("HR") Department as an HR Generalist in September 2001. DSOF 1, 10; PSOF 1. She was promoted to HR Director in January 2012. DSOF 11; PSOF 1. Sometime in 2017, Ms. Ponder's direct supervisor resigned, and she began to report directly to Winnebago County Administrator Amanda Haymaker and Winnebago County Board Chair Frank Haney. DSOF 12; PSOF 2. In November 2017, Carla Paschal (then head of the Finance Department) replaced Ms. Haymaker; after that, Ms. Paschal and Mr. Haney were Ms. Ponder's direct supervisors. DSOF 13, 32; PSOF 2. Ms. Paschal didn't have the authority to terminate Ms. Ponder, but instead could issue recommendations to the County Board Chair (Mr. Haney) or the County Board. *See* DSOF 13; PSOF 3.

Ms. Ponder applied for FMLA leave to care for her husband from March 14, 2019, to June 6, 2019, which the County approved. DSOF 14; PSOF 39. Ms. Ponder voluntarily decided to return to work early on May 6, 2019. DSOF 14; PSOF 39. Ms. Ponder later claimed that she worked remotely during this leave of absence. *See* DSOF 24; PSOF 40.

On May 20, 2019, the "Baker Tilly report" was released to the County Board. DSOF 45. The Baker Tilly report was an "Operational and Organizational Assessment" of the County's HR and Finance Departments completed by Baker Tilly Vichow Krause, LLP. DSOF 43. The assessment was completed in 2018, with

the findings provided to Ms. Paschal and Mr. Haney on August 3, 2018, nearly a

year before the report was provided to the Board. DSOF 43-44. After the report was

released, Ms. Paschal and Ms. Ponder met to discuss the findings. DSOF 45; Dkt.

99-2 at 57:1-3. The report was critical of the HR department, *see* DSOF 44, but the

parties dispute the nature of the conversations between Ms. Paschal and Mr. Haney

on how to move forward with those critical findings. *See* DSOF 46; PRDSOF 46.

On July 5, 2019, the County approved Ms. Ponder's request for intermittent

FMLA leave to care for her husband from June 6 to August 29. DSOF 16.

Less than a week later, on July 10, 2019, Ms. Paschal issued a memorandum

recommending Ms. Ponder's termination (the "recommendation memo") to the

County Board. DSOF 27; PSOF 3. In this memo, Ms. Paschal listed ten ways in

which Ms. Ponder had allegedly failed to satisfactorily perform her duties, violated

County policies, and put the County at risk of civil liability. *See* DSOF 28. These

items included incidents spanning back to 2017 and concerns surfaced by the Baker

Tilly report. *See* DSOF 28, 49, 53. The parties dispute the allegations in the

recommendation memo. *See* PSOF 4-30; DRPSOF 4-30.

From July 18, 2019, to August 15, 2019, Ms. Ponder went on FMLA leave for

her own medical illness. DSOF 17. On July 22, the County approved the request for

this FMLA leave. *Id.*

Ms. Ponder's next request for a leave of absence was not an FMLA request.

DSOF 19. On August 12, 2019, Ms. Ponder requested a discretionary leave of

absence from August 16 to November 15. *Id.* Ms. Paschal denied the request on

August 15. DSOF 23. Five days later, on August 20, Ms. Ponder sent a letter to Ms. Paschal; in this letter, Ms. Ponder claimed that her FMLA leave from March to May 2019 should be redesignated to not count against her FMLA leave entitlement because she had worked remotely during that period. DSOF 24; PSOF 40.

Just two weeks later, the County Board voted to terminate Ms. Ponder on August 22, 2019. DSOF 29. The decision was brought back to the Board for reconsideration on September 19, 2019, during which the Board voted to uphold Ms. Ponder's termination. *Id.*

## III.   Analysis

The only remaining claim before the Court is Ms. Ponder's FMLA retaliation claim. *See* Dkt. 93 at 1; Dkt. 111 at 15; Dkt. 114 at 1. Because of the analogous language in other employment statutes, courts analyze FMLA retaliation claims in the same way that they analyze retaliation claims under other employment statutes, such as the Americans with Disabilities Act or Title VII of the Civil Rights Act of 1964. *Buie*, 366 F.3d at 503; *see also Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 (7th Cir. 2023). A retaliation claim requires three elements: "(1) the employee engaged in statutorily protected activity; (2) the employer subjected her to an adverse action; and (3) the protected activity caused the adverse action." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018).[3]

---

[3] The County initially presents a burden-shifting framework that comes after satisfying the three elements of a retaliation claim, *see* Dkt. 98 at 7, but neither party applies the framework after that, *see* Dkt. 111 at 12; Dkt. 114 at 1. Burden-shifting frameworks can be a way of proving discrimination, but there is no separate requirement. *See Ortiz v. Werner Enters., Inc.*, 843 F.3d 760, 766 (7th Cir. 2016). Regardless, the analysis addressing Ms. Ponder's argument that the County's reasons for her termination are pretextual also addresses the burden-shifting framework presented

7

In this case, the parties agree that Ms. Ponder engaged in statutorily protected FMLA activity and that she was subjected to an adverse employment action (termination). Dkt. 98 at 7; Dkt. 111 at 12. The only remaining question is whether there is a causal connection between Ms. Ponder exercising her FMLA rights and her termination. Dkt. 98 at 7; Dkt. 111 at 12.

"To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010) (internal quotations omitted) (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741-42 (7th Cir. 2008)).[4] Evidence of a causal connection can include "suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination" *Pagel v. Tin Inc.*, 695 F.3d 622, 631 (7th Cir. 2012); *see also Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023). Shifting and changing justifications for the termination also evidence pretext. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738

by the County. *See Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012) ("We have often noted that 'the prima facie case and pretext analyses often overlap.'").

[4] Although the Supreme Court held in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), that Title VII retaliation claims require but-for causation, the Seventh Circuit has not decided whether that also applies to FMLA retaliation claims. *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014). District courts within the Seventh Circuit have taken different approaches. *See Hall v. Bd. of Educ.*, No. 14-cv-3290, 2018 U.S. Dist. LEXIS 13991, at *21-22 (N.D. Ill. Jan. 29, 2018) (collecting cases). However, the Seventh Circuit has continued to apply the substantial-factor test in cases after *Nassar, see, e.g., Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022), so this Court will apply the substantial-factor test in this case.

(7th Cir. 2013). In evaluating the evidence, the key question is whether a reasonable jury could conclude that the protected activity caused the adverse action. *See Ortiz v. Werner Enters., Inc.*, 843 F.3d 760, 765 (7th Cir. 2016); *Mourning v. Ternes Packaging Ind., Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (applying *Ortiz* to an FMLA claim).

The County emphasizes that Ms. Ponder has no knowledge of being terminated for FMLA leave, *see* Dkt. 98 at 11; Dkt. 114 at 5, but that's not the question. The task before the Court is to consider the evidence as a whole and determine whether a reasonable jury could infer whether Ms. Ponder's termination was motivated because she exercised her FMLA rights. *See Ortiz*, 834 F.3d at 765. The undisputed facts in this case generally assert that someone testified to something, but most of the underlying facts are disputed. Because of the disputed nature of the record, the Court finds that answering the causation question requires reconciling competing testimony. At the summary judgment stage, the Court should not be determining credibility and weighing evidence; those functions belong to the jury. *Liberty Lobby*, 477 U.S. at 255; *Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017).[5]

The parties' arguments largely center around whether the County's reasons for terminating Ms. Ponder were pretextual, but there are also some ancillary arguments about suspicious timing and other purported reasons for termination. Viewing the evidence as a whole, the Court finds that there is a genuine dispute as

---

[5] The Court could—and maybe should—end its analysis here. But for the benefit of a complete record, the Court addresses the parties' arguments in detail.

to whether Ms. Ponder exercising her FMLA rights was a substantial or motivating factor in her termination and that, viewing the evidence in Ms. Ponder's favor, a reasonable jury could find that causal connection.

### A. Suspicious Timing

Generally, suspicious timing alone or "mere temporal proximity" is not enough to survive summary judgment. *Riley*, 909 F.3d at 188. This is particularly true if "there are reasonable, non-suspicious explanations for the timing." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2011). But if the time between a protected activity and the adverse action is short enough, suspicious timing can be enough to survive summary judgment. *See, e.g.*, *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("The closer two events are, the more likely that the first caused the second."); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 893 (7th Cir. 1999) (finding that one day was "[s]uch a close proximity . . . sufficient to establish a prima facie case of retaliation").

The timing of the recommendation memo and the termination vote could reasonably be seen as suspicious. Although the County correctly points out that the recommendation memo, issued on July 10, 2019, came over two months after Ms. Ponder returned to work on May 6, Dkt. 114 at 7, the recommendation memo came five days after Ms. Ponder's request for intermittent FMLA leave was approved on July 5. As for the County Board's termination vote on August 22, 2019, the County notes that it was a month and a half after the recommendation memo, *see* Dkt. 114 at 7, but the vote was seven days after Ms. Ponder's FMLA leave from July 18 to August 15. The timing of the termination vote was also only two after Ms. Ponder's

August 20 request to redesignate her March FMLA leave (following the denial of her request for discretionary leave). With the termination vote, however, the County implies that Board didn't know of Ms. Ponder's FMLA leave, *see* Dkt. 98 at 10, or redesignation request, *see* DSOF 15. If the Board didn't know, then the timing of the termination vote cannot be used to infer retaliation. *See Trahanas*, 64 F.4th at 857.

As for the recommendation memo, the County does not argue that Ms. Paschal was unaware of Ms. Ponder's FMLA activity. The five days between the intermittent leave request and the recommendation memo is closer to the short spans of time that courts have found could lead to a reasonable inference of causation than to the longer spans of time that were insufficient to create a triable issue. *Compare, e.g.*, *King*, 166 F.3d at 893 (one day), *and McClendon v. Ind. Sugars*, 108 F.3d 789, 797 (7th Cir. 1997) (two to three days), *with Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (two months). And in one (admittedly old) case, the Seventh Circuit found one week to be short enough. *See Holland v. Jefferson Nat'l Life Ins.*, 883 F.2d 1307, 1315 (7th Cir. 1989). Five days is short enough to let a jury decide whether an inference of causation is appropriate in this case. *See Loudermilk*, 636 F.3d at 315.

But even longer spans of time, like the two months between Ms. Ponder returning from her first FMLA leave to the time of the recommendation memo, *see* Dkt. 98 at 9, can be relevant to the causation question. Although two months is not short enough to independently infer causation, it can be combined with evidence that the employer's explanation for termination was pretextual. *Riley*, 909 F.3d at

188-89. Analyzing the temporal sequence alone, however, "is not a magic formula." *Buie*, 66 F.3d at 506 (quoting *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999)). Timing becomes another consideration in the question of pretext and job performance discussed in the next section.

Ms. Ponder also includes the delayed release of the Baker Tilly report in her arguments about suspicious timing—although the report was provided to Ms. Paschal and Mr. Haney in August 2018, it wasn't released until May 2019. DSOF 44-45. However, the release of the report on its own wasn't an adverse employment action, *see Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007), so the timing of the report is more relevant to the next section.

## B. Job Performance

The County maintains that Ms. Ponder was terminated because of her substandard job performance. *See, e.g.*, Dkt. 98 at 10; Dkt. 114 at 3, 10. When an employer fires an employee for work-related reasons, a court's job is to ensure that the process was not discriminatory. *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 752 (7th Cir. 2009). The question is not how an employer should discipline its employees; rather, the question is whether the employer was earnest in its work-related explanation. *Daugherty*, 577 F.3d at 752. To survive summary judgment, there must be an issue of material fact as to whether the employer's proffered reasons are pretextual. *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). A pretextual decision "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir.

2015) (alteration in original) (quoting *Argyropoulos*, 539 F.3d at 736). There must be "'evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate' the termination." *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 506 (7th Cir. 2017) (quoting *Carter v. Chi. State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015)).

For example, an "unusual deviation from standard procedures" can be evidence of discrimination. *Baines*, 863 F.3d at 664. The County argues that this deviation from standard procedure argument fails because Ms. Ponder does not identify any similarly situated employees. *See* Dkt. 114 at 8-9. It cites *Coleman v. Donahoe*, in which the Seventh Circuit was presented questions about how alike comparators must be and whether such evidence can apply to determining pretext. 667 F.3d 835, 841 (7th Cir. 2012). The Seventh Circuit did not, however, state that a comparator employee was a requirement to showing pretext. *See id.*; *see also Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992); *Kalahar v. Priority, Inc.*, No. 20-C-0055, 2021 U.S. Dist. LEXIS 20395, at *21-22 (E.D. Wis. Feb. 3, 2021). The Court sees evidence of a similarly situated employee as relevant to determining what an employer's standard practice might be, but the absence of such evidence doesn't necessarily nullify Ms. Ponder's argument.

The parties offer little evidence about the County's typical practice or process for terminating an employee—only that Mr. Haney testified that Ms. Paschal should have talked to Ms. Ponder about any performance issues or taken

13

disciplinary measures to give her the opportunity to improve. PSOF 35; Dkt. 111 at 14. Citing different parts of Ms. Ponder's deposition testimony, the parties dispute whether Ms. Paschal had the authority to discipline Ms. Ponder. *See* PSOF 35; DRPSOF 35. Construing that evidence in Ms. Ponder's favor, the Court considers Mr. Haney's testimony that under normal circumstances, Ms. Paschal would have talked to Ms. Ponder about her performance issues. This would have been classic progressive discipline, meaning that the frequency or severity of misconduct or deficiencies results in more severe discipline. *See Norfolk Shipbuilding & Drydock Corp. v. Local No. 684 of the Int'l Bhd. of Boilermakers*, 671 F.2d 797, 799 (4th Cir. 1982); *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023). In examining whether the allegations of poor job performance were pretextual, the Court finds it relevant, but not dispositive, to consider whether Ms. Paschal discussed specific performance concerns or issued discipline to give Ms. Ponder a chance to improve before issuing the recommendation memo.

In addition, as noted above, when accompanied by evidence of a retaliatory motive, suspicious timing can be probative. *Coleman*, 667 F.3d at 861; *Riley*, 909 F.3d at 188-89. Ms. Ponder argues that the timing is suspicious because Ms. Paschal would have known about many of the alleged performance issues for at least a year, but Ms. Paschal took no steps to terminate Ms. Ponder until after her FMLA leave. *See* Dkt. 111 at 14. The County agrees that Ms. Paschal had concerns about Ms. Ponder's performance long before the FMLA leave but argues that this shows that the reasons for termination were *not* pretextual. *See* Dkt. 114 at 6.

The Seventh Circuit has opined on both sides. In dictum, it has speculated that a factfinder could use Ms. Ponder's reasoning to infer retaliation. *See Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) ("We can imagine circumstances in which the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on incidents of which the employer had already been aware)."). But the Seventh Circuit has ruled the opposite way. For example, in *Buie*, it found that no reasonable jury could infer that the employee was fired because of his disability or because the announcement of his disability could result in taking FMLA leave. 366 F.3d at 507. It noted that the employee was warned nearly three months before termination that he could be fired if he continued to have attendance problems and found that the employee "had every reason to believe that he was on the edge of termination" when he announced his disability. *Id.* Drawing from that example, in looking at the evidence about how long Ms. Paschal observed the issues she found with Ms. Ponder's performance and whether Ms. Paschal communicated her concerns, the Court considers it as evidence relevant to determining when Ms. Paschal began to see those issues as bases for termination.

When an employer offers multiple reasons for the termination, there must be a genuine dispute as to whether each proffered reason was pretextual, unless the multiple reasons are especially intertwined or unless one of the reasons is especially

"fishy and suspicious." *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)). The County argues that it had "at least eleven" reasons for terminating Ms. Ponder, none of which were related to FMLA. Dkt. 114 at 3. Based on the County's cited facts, the eleven reasons appear to be the ten reasons articulated in Ms. Paschal's memo, plus the asserted fact that Ms. Paschal had lost faith in Ms. Ponder's ability to perform her duties. *See id.*; DSOF 26, 27. The following analysis looks at each reason in turn.

### 1. Other department heads' lack of trust in HR

Ms. Paschal wrote in the recommendation memo that other departments didn't trust HR because Ms. Ponder was inconsistent with response times and because she could not be trusted to keep things confidential. PSOF 4; DSOF 36. Ms. Paschal also testified that her predecessor, Ms. Haymaker, had told her that Ms. Ponder was not viewed as a good employee. DRPSOF 6; Dkt. 99-2 at 20:10-11. Mr. Haney testified in his deposition that Ms. Paschal had previously discussed this to him only in the context of general staffing shortages and not limited to the HR department—not as an issue with Ms. Ponder's performance. PSOF 6.

The parties also dispute whether Ms. Paschal ever talked to Ms. Ponder about these concerns. *See* PSOF 4; DRPSOF 4. Ms. Paschal testified in her deposition that she told Ms. Ponder that the circuit court and clerk's office didn't want to work with her because they lacked confidence in her, but that the sheriff's department merely told Ms. Ponder that they had their own HR people. Dkt. 99-2 at 48:9-24. Ms. Ponder testified in her deposition that she didn't know which

16

department or officials would have expressed a lack of confidence in her to Ms. Paschal because Ms. Paschal never talked to her about it. Dkt. 99-1 at 73:10-74:1. As for not maintaining confidentiality, the County cites the same portions of Ms. Paschal's deposition testimony about a lack of confidence (without specific reference to confidentiality) and deposition testimony from both Ms. Ponder and Ms. Paschal about the handling of a confidential report. *See* DRPSOF 5. At most, the cited lines of the deposition indicate that Ms. Ponder knew about the state's attorney's investigation into her handling of that report, but there is no link between that and other departments not trusting Ms. Ponder to maintain confidentiality.

Based on this evidence, determining whether the lack of trust from other departments was a pretext involves weighing Ms. Paschal's testimony against Mr. Haney's and Ms. Ponder's. This reconciling of differing testimonies is the kind of job left for a jury. *See Liberty Lobby*, 477 U.S. at 255. In addition, there is the added layer of weighing the timing factor: Ms. Paschal testified that Ms. Ponder's performance had been an ongoing issue during Ms. Paschal's entire time supervising Ms. Ponder, but the parties dispute whether anything was said before the recommendation memo. *See* PSOF 4; DRPSOF 4. Viewing the evidence in Ms. Ponder's favor, a reasonable jury could find that the lack of trust in HR was more about broader staffing issues with the department and less about Ms. Ponder's individual performance—until it came time to write the recommendation memo after Ms. Ponder started taking FMLA leave.

## 2. *Implementation of compensation policies and tracking*

The second item in the recommendation memo was that Ms. Ponder had missed a deadline for a project to implement compensatory time policies and tracking in the employee management system. *See* PSOF 7; DSOF 49. Ms. Ponder testified in her deposition that she did not recall committing to having a review completed and submitted by the deadline noted in the recommendation memo. PSOF 7. In addition, she attributed any delay to the fact that she had been out on FMLA leave. *Id.* The FMLA doesn't protect an employee from bad performance, but "it can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave." *Pagel*, 695 F.3d at 629. Ms. Ponder wasn't on FMLA leave at the time of the deadline, DSOF 52, but viewing the evidence in light most favorable to Ms. Ponder, a reasonable jury could find that Ms. Ponder's FMLA leave could lead to a delay in completing work, and that creates a genuine dispute as to whether this basis for termination was pretextual. *See Pagel*, 695 F.3d at 629-30.

Ms. Ponder argues that timing is also relevant here. *See* Dkt. 111 at 13. Ms. Paschal testified that the Finance Department had been waiting on this project during her entire tenure at the County. DSOF 50. However, Mr. Haney testified that Ms. Paschal never discussed this issue with him. PSOF 7. Drawing reasonable inferences in Ms. Ponder's favor, a jury could find that this was not a basis for termination before the recommendation memo.

18

### 3. Compliance with OSHA training requirements

The next item in the recommendation memo was that HR had not ensured compliance with OSHA training requirements. DSOF 47-48; PSOF 8. Ms. Ponder asserts that the absence of an OSHA trainer caused the delay in OSHA training and that she was not authorized to hire another trainer. PSOF 8-9.[6] The parties dispute whether Ms. Paschal ever discussed this issue with Mr. Haney: Mr. Haney testified that he did not recall Ms. Paschal discussing the issue when asked about the recommendation memo, and he also testified that there were generally discussions about terminations for every department based on the Baker Tilly report. Dkt. 99-3 at 70:23-71:20, 78:20-79:2; *see* PSOF 9; DRPSOF 9.

Ms. Paschal didn't discuss this specific issue with Ms. Ponder before the release of the Baker Tilly report in May 2019, but they did discuss it after the report was public. Dkt. 99-2 at 56:22-57:9; DSOF 47. This item was based on a finding in the Baker Tilly report, the timing of which is analyzed later in this opinion. But even though they did talk about the matter, Ms. Ponder asserts that Ms. Paschal never indicated any urgency in hiring another OSHA trainer. PSOF 9. Whether this issue was seen as a specific performance failing of Ms. Ponder or a basis for her termination before Ms. Ponder started taking FMLA leave is again a question of weighing different testimonies.

---

[6] The County argues that Ms. Ponder's failure to mention an OSHA trainer during her deposition contradicts her declaration. *See* DRPSOF 8. The cited deposition testimony establishes that HR was responsible for OSHA training, but Ms. Ponder's declaration does not disclaim that responsibility in saying that the County needed to hire an OSHA trainer. *See* Dkt. 109 ¶ 12.

### 4. *Developing recruitment strategies*

The fourth item was that HR had not developed successful recruitment strategies for other departments and elected offices. PSOF 10. In particular, Ms. Ponder's adoption of expensive geofencing technology for recruitment had not produced as many job candidates as the County was hoping for. *Id.*; DSOF 54-55. As with other issues, Mr. Haney testified that Ms. Paschal had never framed issues with geofencing and recruitment as an area of concern for Ms. Ponder's performance. PSOF 12.

Ms. Ponder asserts in her declaration that she had discussed with Ms. Paschal that this was a newer technology that would take some time to work with the vendor to get the results the County wanted. PSOF 11. The County argues that this contradicts Ms. Ponder's deposition testimony that she had never been counseled about the project, DRPSOF 11, but the deposition testimony isn't inconsistent with her assertion that Ms. Paschal never presented the lack of success with geofencing as a shortcoming with Ms. Ponder's performance, *see* PSOF 11. Also, Ms. Paschal testified that she had discussed the geofencing project's failure with Ms. Ponder. Dkt. 99-2 at 58:23-59:5; *see* DSOF 55.

Similar to earlier items, there is conflicting testimony around what conversations transpired and what expectations were set before the failed geofencing project became an indication of a failure to develop recruitment strategies and became a basis for terminating Ms. Ponder. These conflicts present a genuine dispute as to whether this item in the recommendation memo was an honest reason for termination.

20

### 5. *Updating and monitoring HR policies*

The fifth item was that HR had not adequately monitored the development and updates of its policies. DRPSOF 13; DSOF 37. As an example, the recommendation memo referenced—ironically—Ms. Paschal revising a discrimination and harassment policy for Ms. Ponder. DRPSOF 13; DSOF 37. Ms. Paschal had informed Ms. Ponder in late 2017 that the policies needed to be updated due to changes in Illinois law that would take effect on January 1, 2018. *See* DSOF 38. Ms. Paschal reminded Ms. Ponder multiple times before drafting the update herself in June 2018. DSOF 39.

Ms. Ponder disputes that this was an example of her "dropping the ball." *See* PSOF 14. Her understanding of Ms. Paschal drafting a revised discrimination and harassment policy was that it was because Ms. Paschal was aware of the staffing shortage in the HR department. *Id.* The County claims this contradicts Ms. Ponder's deposition testimony, in which Ms. Ponder merely testified that she did not recall being tasked with updating the policies or whether she did update them. Dkt. 99-1 at 81:4-9. It's plausible that she forgot during her deposition, but then remembered later; determining the credibility of Ms. Ponder's statements is a function for a jury. In addition, Mr. Haney testified that this issue was *never* a reason for termination. PSOF 15. Again, determining whether this reason for termination was pretextual requires weighing competing testimonies, making it a genuine dispute.

### 6. *2018 internship program*

The sixth item in the memo states that Ms. Ponder failed to use the funding allocated in 2018 for an internship program, despite other departments requesting

21

interns. DSOF 57; PSOF 16. The parties dispute why no interns were hired,[7] but
the more relevant evidence for the pretext question is about how this was viewed (if
at all) in the context of Ms. Ponder's performance. Mr. Haney testified that he and
Ms. Paschal never discussed this issue. PSOF 18. In fact, he thought it was an
"absurd" and "embarrassing thing to have in a termination letter." *Id.*; Dkt. 111 at
13. He also asserted that this was a new requirement put on Ms. Ponder after the
fact, PSOF 18, but the County argues that this fell under Ms. Ponder's
responsibility of developing and managing recruitment programs, DRPSOF 18
(citing the job description for HR director). Ms. Ponder asserts that Ms. Paschal
never discussed the issue with her and never indicated that it was a performance
issue. PSOF 17. Ms. Ponder also argues that the timing of this is suspicious because
it had been a year since the incident. Dkt. 111 at 13. Viewing all the testimony in
Ms. Ponder's favor, a reasonable jury could find that the internship program wasn't
seen as a reason for termination until Ms. Ponder started taking FMLA leave.

### 7. *Online employee training platform*

The next item states that Ms. Ponder failed to implement an online employee
training platform that the County had budgeted funds for in 2018. DSOF 59-60;
PSOF 19. HR began working on the project in March 2018. DSOF 60. Based on
conversations between Ms. Paschal and the vendor in July 2019, HR allegedly
delayed the project by not providing the necessary information to the vendor

---

[7] Ms. Paschal's understanding was that there was never a job posting for an internship. DSOF 57.
Ms. Ponder delegated the task to someone else in her office so she did not remember any specifics
during her deposition. DSOF 58. In her declaration, Ms. Ponder asserted that there had been no
qualified candidates when other departments requested interns. PSOF 17.

providing the training platform. *See* PSOF 19; DSOF 61. Sometime after, on July 11, 2019, Ms. Ponder sent a memorandum on the status of the training project, in which she detailed how staffing shortages and other circumstances had caused delays. DSOF 62-63.

Ms. Paschal testified that the project needed to be completed by the end of the 2019 fiscal year. DSOF 66. Ms. Ponder asserts that it wasn't until July 9, 2019, that Ms. Paschal asked to prioritize this project. PSOF 20. Even though the project started in March 2018, there was no issue until after Ms. Ponder started exercising her FMLA rights. *See* Dkt. 111 at 13. And like with the other items, Ms. Ponder testifies that Ms. Paschal never talked to her about this issue as being a problem with her performance. PSOF 20. Likewise, Mr. Haney testified that the delays were just delays—not some "elevated issue." PSOF 21. Whether this reason for termination was pretextual depends on assessing the credibility of Ms. Ponder and Mr. Haney, which is a job for a jury.

### 8. *FOIA request*

The eighth item in the recommendation memo states that Ms. Ponder's lack of a timely response to a FOIA request resulted in a lawsuit against the County. PSOF 22; DSOF 40, 42. The parties dispute whether the requested documents existed and how that led to the delayed response. *See* DSOF 41; PSOF 23.[8] But

---

[8] In responding to PSOF 23, the County is correct in its observation that Ms. Ponder's deposition testimony doesn't cover whether the requested documents existed at the time of the request (but in the wrong format), but the cited deposition testimony is Ms. Ponder being asked to confirm an exhibit that recounted the chronology of the FOIA request and lawsuit. *See* DRPSOF 23; Dkt. 99-1 at 88:18-89:20; Dkt. 115-1. That doesn't present a direct contradiction with Ms. Ponder's declaration.

again, the relevant evidence is the evidence that sheds light on whether the County honestly believed this to be a reason to terminate Ms. Ponder. Similar to some of the above reasons in the recommendation memo, Mr. Haney testified that this item was "absurd" and that Ms. Paschal had never discussed this issue before Ms. Ponder's termination. PSOF 25; Dkt. 111 at 13.

### 9. Missed deadlines

The ninth item states that Ms. Ponder missed deadlines on a regular basis. PSOF 26. Ms. Paschal testified that this was an issue throughout her time as Ms. Ponder's supervisor. DSOF 35. Ms. Ponder argues that the timing is suspicious. Dkt. 111 at 13. She asserted that Ms. Paschal understood that this was the result of staffing shortages and never indicated concern with Ms. Ponder's performance in meeting deadlines. PSOF 26. However, Ms. Paschal testified in her deposition that, although she never explicitly told Ms. Ponder that she had an overall problem of getting things done on time, Ms. Paschal believed that she sent that message by repeatedly asking her for the same things. DRPSOF 26; Dkt. 99-2 at 22:4-15. According to Ms. Paschal, an intelligent professional employee would have understood that something was wrong because of those repeated requests. Dkt. 99-2 at 22:17-23:7. Mr. Haney testified that waiting on a task to be completed might have been discussed as a status update, but never as a basis for terminating Ms. Ponder. PSOF 27.

There's the similar competing testimony of whether this was viewed as an issue worthy of termination before Ms. Ponder began taking FMLA leave. Unlike some of the other items in the recommendation memo, this item is supported by Ms.

Paschal's testimony that she "sent the message" to Ms. Ponder, DRPSOF 26, but a jury is still needed to determine whether that was enough to indicate to Ms. Ponder that she could be terminated and whether it negates Ms. Haney's testimony.

### 10. Sexual harassment investigation and report

The last item in the recommendation memo states that Ms. Ponder incorrectly started a sexual harassment investigation based on a complaint that alleged no sexual conduct and that Ms. Ponder mishandled the confidential report from the investigation. *See* PSOF 28. The nature of the harassment and whether the report was properly secure, which the parties dispute, *see* PSOF 29-30; DRPSOF 30, seems beyond the purview of the Court because it's more about the evaluation of Ms. Ponder's job performance. *See Harden*, 799 F.3d at 864.

There's no evidence unique to this reason to raise a genuine dispute as to whether it was pretextual, but the issue of confidentiality is also part of the first reason in the recommendation memo—the County argues that Ms. Ponder should have known there were concerns about her ability to keep things confidential because of the state attorney's investigation into her handling of the report. *See supra*; DRPSOF 5. Because of the intertwined nature of these reasons in the recommendation memo, the evidence showing that nobody had talked to Ms. Ponder about confidentiality issues applies to this part too. *See Fischer*, 519 F.3d at 408.

### 11. Ms. Paschal's lack of faith and the Baker Tilly report

Finally, the County cites Ms. Paschal's lack of faith in Ms. Ponder's abilities as one of the eleven reasons for the termination. *See* Dkt. 114 at 3. In the deposition testimony cited for this asserted fact, Ms. Paschal testified that Ms. Ponder "was

not functioning adequately to oversee the department" and that the Baker Tilly report had surfaced some issues. Dkt. 99-2 at 35:16-36:2. The parties dispute how Ms. Paschal and Mr. Haney responded to the report's findings, *see* PRDSOF 46; viewed in Ms. Ponder's favor, there was some discussion about the HR Director position, but no decision to replace Ms. Ponder. *Id.*

Ms. Ponder asserts that the first time she felt that Ms. Paschal had any serious concerns about her job performance was when they met after the Baker Tilly report was released. PSOF 31. However, Ms. Ponder's impression at the end of that meeting was that they would put together a plan for addressing the issues raised by the report, and not that Ms. Paschal was considering any kind of employment action against Ms. Ponder. *Id.*

Ms. Ponder also argues that the timing of the report's release was suspect because Ms. Paschal didn't act on any of the issues in the report until after Ms. Ponder returned from her first FMLA leave. *See* Dkt. 111 at 13-14. The County argues that Mr. Haney was responsible for the delay, not Ms. Paschal. *See* Dkt. 114 at 6. There is some support in the record that Mr. Haney was the cause, but there is no explanation behind the delay. *See* Dkt. 98 at 8; Dkt. 99-3 at 57:15-17; DRPSOF 9. The County's argument seems to imply that Mr. Haney didn't want the report released until May 2019, but that is not supported by the record.[9] Then again,

---

[9] Although Ms. Paschal testified that Mr. Haney told her not to release the report, DRPSOF 9, Mr. Haney's testimony is less certain. Tracing the County's citation in its brief leads to Mr. Haney's deposition testimony that "there was a realization [the report] was never shared with the Board." Dkt. 99-3 at 57:16-17. But Mr. Haney also testified that he didn't know why the report was held for so long. Dkt. 99-3 at 57:20-58:16, 59:2-20 ("But in all honesty, I don't know why it wasn't shared earlier.").

although there was a delay, that doesn't negate the possibility of Ms. Paschal acting earlier on some of the deficiencies identified, without revealing the specific findings of the report. *See* Dkt. 111 at 14.

Because the facts must be construed in Ms. Ponder's favor at this stage, *see Rickher*, 535 F.3d at 664, a reasonable jury could find that the Baker Tilly report wasn't a reason for terminating Ms. Ponder, even if it did raise concerns about the way she ran her department. The more general lack of faith from Ms. Paschal, which is also intertwined with many of the reasons in the recommendation memo, lacks support in the record as a reason for termination that existed before Ms. Ponder started taking FMLA leave (even if Ms. Paschal had concerns before).

## C. Other Reasons for Termination

Although it maintains that Ms. Ponder's unsatisfactory job performance was the sole reason for her termination, the County also references two other possible reasons for Ms. Ponder's termination that were raised in Ms. Ponder's and Mr. Haney's depositions. *See* Dkt. 98 at 11; Dkt. 114 at 4-5. The Court will set aside the propriety of counsel—as opposed to the employer—articulating a purported legitimate basis for discharge. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (finding pretext shown by after-the-fact justifications provided following the filing of the action). Neither eliminates the possibility that a reasonable jury could find that the County retaliated against Ms. Ponder for exercising her FMLA rights.

### 1. The "larger political battle" at the County

The County notes that although Mr. Haney disagreed with Ms. Paschal's recommendation to terminate Ms. Ponder, Mr. Haney testified in his deposition that he did not believe FMLA played any role in Ms. Ponder's termination—rather, the "larger political battle at the County" was the cause. Dkt. 114 at 4-5 (internal quotations omitted).[10] Neither party offers any evidence (outside of Mr. Haney's testimony) to support or refute the alleged role of County politics in Ms. Ponder's termination. Determining the role of County politics comes down to how much credibility and weight to give to Mr. Haney's testimony, and that is a task left for a jury. To the extent that the County offers this portion of Mr. Haney's testimony to question his credibility on the pretext question, *see* Dkt. 114 at 4-5, that is also an argument to be made to a jury.

If County politics did play a role, that alone does not foreclose the possibility of FMLA playing *a* role; to survive summary judgment, a reasonably jury needs only to be able to conclude that FMLA was a substantial factor in Ms. Ponder's termination, not that it was the sole reason. *See Goelzer*, 604 F.3d at 995. Indeed, Mr. Haney may be partially correct: Ms. Ponder's termination was politically motivated. But that doesn't exclude that Ms. Ponder's exercise of her FMLA rights may have also been a motivating factor. To say that Mr. Haney's assertion undercuts Ms. Ponder's pretext argument is logically no different than offering some other nondiscriminatory reason for termination (such as substandard job

---

[10] To be sure, people in the community may likewise hold this belief, but factual disputes are decided by juries on evidence and rules of procedure.

performance). A statement from the employer that there was no discrimination or that there was another reason for termination must still be examined. *See Ortiz*, 834 F.3d at 765 (stating that "factfinders must ask themselves what the admission means" even with "the fabled employer who admits to firing an employee because of race"). Mr. Haney's testimony has evidentiary value in answering the pretext question, *see Kohls*, 259 F.3d at 806, but it alone doesn't conclusively determine why Ms. Ponder was terminated.

### 2. *Ms. Paschal's harassment claim*

The County claims that Ms. Ponder testified that FMLA had nothing to do with her termination and instead provided an alternate, non-FMLA reason: retaliation for Ms. Ponder providing information that adversely affected Ms. Paschal's harassment claim against Mr. Haney in May 2019. Dkt. 98 at 11; Dkt. 114 at 5; DSOF 31. However, this argument fails to undercut Ms. Ponder's pretext argument for a few reasons.

First, the factual record doesn't support the County's interpretation of Ms. Ponder's deposition testimony. PRDSOF 31. In the County's cited portion of Ms. Ponder's deposition, Ms. Ponder testified that her relationship with Ms. Paschal changed based on providing information to the investigator. Dkt. 99-1 at 64:17-65:12. Then Ms. Ponder was asked about the relationship between Mr. Haney and Ms. Paschal, which Ms. Ponder characterized as "[h]orrendous." *Id.* at 65:13-18. The next two questions asked about the deterioration of Mr. Haney and Ms. Paschal's relationship, to which Ms. Ponder answered that Ms. Paschal took power away from Mr. Haney because he refused to recommend Ms. Ponder's termination. *Id.* at 65:19-

29

66:6. This deposition testimony shows, according to Ms. Ponder, that her relationship with Ms. Paschal devolved because of Ms. Ponder's actions during the investigation into Ms. Paschal's harassment claim and that Mr. Haney's relationship with Ms. Paschal devolved because of their disagreement over Ms. Ponder's termination. There is no speculation about the cause of termination, FMLA or otherwise. The lack of support from the cited evidence renders the factual assertion null. *Malec*, 191 F.R.D. at 583.

The second and third reasons why the County's argument fails mirror the analysis above for Mr. Haney's testimony about County politics. Neither party offers any evidence to corroborate this alleged reason for termination, so whether Ms. Paschal retaliated for the information Ms. Ponder provided in the investigation becomes a question of how to consider Ms. Ponder's testimony. And even if this did factor into Ms. Paschal's decision to terminate Ms. Ponder, that doesn't necessarily foreclose Ms. Ponder's position. A reasonable jury could still find that the FMLA leaves of absence were a substantial factor in her termination, and it would be up to that jury to decide how to weigh the evidence.

\*　　\*　　\*

Taking a step back and examining the evidence as a whole, the key question is whether the evidence would permit a reasonable jury to conclude that Ms. Ponder exercising her FMLA rights was a substantial factor in her termination. *See Ortiz*, 834 F.3d at 765; *Goelzer*, 604 F.3d at 995. The County argues that Ms. Ponder was terminated because of her lackluster job performance, with Ms. Paschal's

recommendation memo serving as the primary source to describe Ms. Ponder's shortcomings. Ms. Ponder argues that this was pretextual, asserting that Ms. Paschal covering for Ms. Ponder during her absence shows a motive for retaliation and that the timing of her termination is suspicious. *See* Dkt. 111 at 13.

The recommendation memo was issued five days after the approval of Ms. Ponder's second FMLA request and two months after Ms. Ponder returned from her first FMLA leave. The five days may be short enough to infer retaliation, *see Loudermilk*, 636 F.3d at 315, but the timing of events in this case also goes to determining pretext. *See Riley*, 909 F.3d at 188-89. Although the recommendation memo detailed many failings that preceded Ms. Ponder exercising her FMLA rights, for nine of them, there is competing testimony as to whether those were concerns specifically about Ms. Ponder's performance and seen as bases for termination before Ms. Ponder's leaves of absence. And many of the reasons revolving around Ms. Ponder's purported inability to meet deadlines or keep things confidential are so intertwined that the exercise of evaluating those reasons in isolation is unnecessary. *See Fischer*, 519 F.3d at 408.

The lack of communication between Ms. Paschal and Mr. Haney in particular raises questions of whether Ms. Paschal followed the normal practice of dealing with an underperforming employee. The only evidence of what was normal practice is Mr. Haney's testimony that Ms. Paschal should have issued writeups or performance improvement plans to give Ms. Ponder an opportunity to improve first.

PSOF 35; Dkt. 111 at 14. Sorting out whether Ms. Paschal should have done so and whether she did requires a jury to weigh the competing testimony.

The County also argues that Ms. Paschal did bring Ms. Ponder's performance issues to Mr. Haney's attention before March 2019. Dkt. 114 at 6, 9. Mr. Haney testified that Ms. Paschal did so during discussions of gaps in multiple departments that included HR. Dkt. 99-3 at 36:22-37:13; *see* DRPSOF 34. But when asked about the specific incidents listed in the recommendation memo, he testified that they had not been brought to him as reasons to terminate Ms. Ponder. If Ms. Paschal did talk to Mr. Haney about these issues in terms of potentially terminating Ms. Ponder, that could rebut Ms. Ponder's pretext argument, but it requires a jury to decide how much credibility to assign to each person's testimony.

All the evidence, viewed in light most favorable to Ms. Ponder, could lead a reasonable jury to conclude that Ms. Ponder was terminated for exercising her FMLA rights. And that isn't necessarily negated just because the recommendation memo didn't mention Ms. Ponder's FMLA leave, *see* Dkt. 98 at 9, or because Mr. Haney testified that FMLA played no role, *see* Dkt. 114 at 4-5. It is up to a jury to weigh that against the other evidence.

## IV.    Conclusion

The undisputed facts in this case show that declarants testified to various statements, but the parties dispute whether many of those statements are true. Consequently, resolving the FMLA retaliation claim in this case requires weighing competing testimony and determining the credibility of the declarants. This is a job for a jury, and the Court finds that, based on the factual record in this case, a

reasonable jury could find in favor of Ms. Ponder. The County's motion for summary judgment is denied.

The parties should consult with each other to decide whether they would like to schedule a settlement conference with Magistrate Judge Jensen or whether they would like to prepare a final pretrial order. By November 21, 2023, counsel should file a notice with the Court as to how they would like to proceed.

Date:  November 13, 2023

Honorable Iain D. Johnston
United States District Judge